Irving **MARIASH**, Plaintiff-Appellant,

v.

Charles **MORRILL** and Bernard **Berwick**, Defendants,

and

David R. Pokross et al., Defendants-Appellees.

No. 889, Docket 73–2587.

United States Court of Appeals, Second Circuit.

Argued April 18, 1974.

Decided May 10, 1974.

---

Irving Mariash (Harry H. Lipsig, New York City, on the brief), plaintiff-appellant pro se.

Frederick A. Nicoll, New York City (Rogers Hoge & Hills, New York City, on the brief; W. Hubert Plummer, New York City, of counsel), for defendants-appellees.

Before KAUFMAN, Chief Judge, CLARK, Associate Justice,* and SMITH, Circuit Judge.

IRVING R. KAUFMAN, Chief Judge:

Although the Securities Exchange Act of 1934 [1934 Act] [1] is hardly a model

---

* United States Supreme Court, retired, sitting by designation.

1. 15 U.S.C. § 78a et seq.

of precision, the statute does speak with atypical clarity in authorizing nation-wide service of process.[2] We thus find erroneous the district court's dismissal of this complaint, alleging in substance a violation of Section 10(b) of the 1934 Act[3]—not for improper venue (Fed.R.Civ.P. 12(b)(3)) and not for failure to state a claim (Fed.R.Civ.P. 12(b)(6)) —but for lack of jurisdiction over the person of the moving defendants (Fed.R.Civ.P. 12(b)(2)), all of whom had been personally served in Massachusetts. Convinced that there is nothing so extraordinary about this case to justify such disposition, and after concluding that no alternative grounds for dismissal can be supported on the record before us, we reverse.

### I

Since this appeal comes to us at a very early stage in the litigation, we have had, by necessity, to glean the facts from the barest skeleton of a record— the complaint and affidavits in support of and in opposition to the motion to dismiss—fleshed out only minimally by the depositions of plaintiff-appellant Irving Mariash and defendant-appellee A. Warren Wilkinson, taken to shed some additional light on that motion. In late November 1967, six men, including defendant Charles Morrill, organized Viatron Computer System Corporation [Viatron] under the laws of Massachusetts. The founders selected the Boston firm of Peabody, Brown, Rowley & Story [Peabody, Brown] to serve as legal counsel to the corporation. Defendants David Pokross and Wilkinson, partners in Peabody, Brown, were invited, moreover, to serve as Director and "Clerk," respectively, of Viatron.

Presumably, to avoid the costs of compliance with the registration requirements of Section 5 of the Securities Act of 1933 [1933 Act], 15 U.S.C. § 77e, the organizing group elected to obtain initial capitalization through a private placement exempt from registration under Section 4(2) of the 1933 Act, 15 U.S.C. § 77d(2).[4] Accordingly, the founders sought out friends and relatives who would be willing to purchase Viatron stock, bearing a restrictive legend (so-called "letter stock"), for investment purposes only.

In the late fall of 1967, Dr. Edward Bennett, one of the original organizers and President of Viatron, approached his uncle, Mariash, in New York City about investing in Viatron stock. Bennett explained to Mariash that the Viatron securities were of a restricted nature and could not be freely traded unless and until Viatron's counsel, Peabody, Brown, considered it proper to release the restrictions. Authorization for that release, moreover, would take the form of an opinion letter, issued by Peabody, Brown, to Viatron's transfer agent. With these limitations in mind, Mariash purchased 250 shares of Viatron stock for $25,000. Following a series of stock splits, Mariash's total share holdings multiplied to 50,000 shares of restricted, Viatron stock.

Among the other private placement sales which occurred during this period of initial capitalization was one by Morrill to his cousin, defendant Bernard Burwick. Burwick purchased 78,600 shares of Viatron for an amount not disclosed in the record—all of which, like Mariash's, were of a restricted nature.

On July 20, 1970, some time after Viatron had floated a public issue of its common stock, Dr. Bennett was removed from the position of President of the company. Shortly thereafter, with the market for Viatron stock falling, Mariash contacted Morrill and, subsequently, Peabody, Brown, demanding an opinion letter authorizing the release of his

---

2.  15 U.S.C. § 78aa.

3.  15 U.S.C. § 78j(b).

4.  Section 4, 15 U.S.C. § 77d, states:
    The provisions of section 5 shall not apply to—
    (2) transactions by an issuer not involving any public offering . . . .

shares' restrictions. He urged, as grounds for his request, that Bennett's removal represented a "change of circumstances," which entitled Mariash to alter his investment status and sell his shares. Mariash claims he first spoke to Wilkinson about obtaining such opinion letter by telephone on August 11, 1970. Wilkinson, in his deposition, stated that Mariash did not speak with him until August 17. There is agreement, however, that the first letter sent to Wilkinson by Mariash, concerning preparation of an opinion letter, was dated August 14, 1970.

Following receipt of this letter, Wilkinson told Mariash that he would be reluctant to prepare an opinion letter without a supporting opinion by independent New York counsel. Mariash then obtained an opinion letter from Breed, Abbott & Morgan, while Mariash's broker, F. I. duPont, Glore Forgan & Co. [duPont], secured a similar letter from its counsel, Carter, Ledyard & Milburn. Both letters, dated August 20, were promptly mailed to Wilkinson in Boston. On August 24, 1970, Wilkinson drafted an opinion letter, addressed to Viatron's transfer agent, First National City Bank [FNCB] in New York City, authorizing the removal of the restrictive legend on Mariash's 50,000 shares of Viatron stock.

The August 24 letter was received by FNCB in New York on August 26. More importantly, according to Mariash's deposition testimony, he did not receive his copy of the opinion letter until August 26. Upon its receipt, he stated, he immediately brought the letter to duPont to provide the basis for his request that his Viatron stock be offered for sale on the open market. To his chagrin, however, he was informed by duPont that such sale would now be difficult because a large block of approximately 75,000 shares had already been placed on the market. After some inquiry, Mariash learned that this large block of Viatron stock had been offered for sale by Goodbody & Co. on behalf of Bernard Burwick.

Burwick, like Mariash, required, as a prerequisite to the sale of his "letter stock," an opinion letter from Peabody, Brown authorizing the transfer agent to remove the restrictive legend. Indeed, Burwick had tried to obtain such a letter in late 1969 but when his counsel, Ropes & Gray, balked at issuing a supporting opinion, Peabody, Brown refused the request. It appears from the record that Burwick was similarly unsuccessful at that time in his effort to secure a "no action" letter from the Securities Exchange Commission which, we understand, would also have facilitated sale of the restricted stock. On August 26, 1970, however, Burwick visited Wilkinson once again, and repeated his request for the necessary opinion letter. To support his "change of circumstances" justification for the letter, Burwick proffered a medical certificate, dated August 25, 1970, reporting Burwick's poor health. After Wilkinson telephoned Ropes & Gray and learned that this time it would agree to provide a supporting opinion, he agreed to furnish the requisite opinion letter to Burwick.

The record is silent as to when Burwick's opinion letter, dated August 26, reached FNCB, or for that matter, when Burwick received it, although we note that, unlike Mariash's opinion letter, a copy of the Burwick opinion letter was prepared for Burwick's broker, Goodbody & Co. In any event, according to Mariash's version of the facts, when he arrived at his broker's office in New York some time on August 26, Goodbody & Co. had already announced for sale Burwick's 78,600 shares of Viatron stock. It cannot reasonably be disputed, moreover, that the market value of Viatron facing Mariash had been depressed by Burwick's prior offer to sell his large block of stock.

On January 31, 1973, Mariash, a New York resident, filed a complaint in the Southern District of New York against Morrill, Burwick, and twelve members of Peabody, Brown, including Pokross and

Wilkinson.[5] The complaint, sprinkled with the usual number of hortatory terms, alleged *inter alia* that the defendants had breached their contractual agreement with Mariash by unreasonably delaying issuance of his opinion letter, and that the defendants, in the words of the complaint:

> secretly and maliciously conspired to favor the defendant, Berwick [sic], a relative of defendant, Morrill, and issued to him with full knowledge of its illegality, and unknown to plaintiff, an "opinion letter" unjustifiably and unlawfully releasing his 75,000 shares of restricted stock, all to the detriment of the market price of Viatron, and to the detriment of the plaintiff, and all in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934.

In lieu of filing an answer to the complaint, the Peabody, Brown defendants moved, pursuant to Fed.R.Civ.P. 12(b)(2) and (3), to dismiss the complaint for lack of personal jurisdiction and improper venue, respectively, or, in the alternative, for a change of venue to the United States District Court in Massachusetts on the ground of inconvenience, 28 U.S.C. § 1404(a). After argument was heard on April 27, 1973, the court ordered that depositions be taken of Mariash and one of the moving defendants for the limited purpose of determining Peabody, Brown's "contacts" with New York. Reargument, following depositions of Mariash and Wilkinson, was heard on July 20.

On September 5, 1973, the district judge, in a brief, unreported opinion, granted the motion to dismiss, pursuant to Rule 12(b)(2), for lack of in personam jurisdiction over the Peabody, Brown defendants. The lower court rejected Mariash's claim that Peabody, Brown was "doing business" in New York through the agency of Dr. Bennett, in the course of his solicitation of Mariash in New York City, thereby eliminating the applicability of New York's long arm statute, N.Y.C.P.L.R. § 302(a)(1). The court also rejected Mariash's alternative contention that personal service in Massachusetts was authorized by Section 27 of the 1934 Act, 15 U.S.C. § 78aa, stating, without explanation:

> Section 27 is no more than a grant of subject matter jurisdiction to the federal district courts—competence to hear a suit arising under the Act—and a statement of the venue requirements to be followed when such suits are brought. *It does not deal with jurisdiction of the persons named as defendants in a given case.* (emphasis added)

## II

Without reaching the question of in personam jurisdiction under New York law, and, of course, without expressing any views on the ultimate merit of Mariash's claims, we cannot accept the district court's interpretation of Section 27 of the 1934 Act. It is simply too late in the day to argue that Section 27 does not authorize nationwide service of process on any individual named in the complaint, provided, of course, the complaint states a claim under the 1934 Act. In this respect, the language of the statute is clear:

> Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, . . . may be brought in any such district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, *and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.*

15 U.S.C. § 78aa (emphasis added). And, the decisions of this Court amply support this interpretation. *See, e. g.*

---

5. The complaint against one of the Peabody, Brown defendants, Dean W. Carlston, has been dismissed by stipulation of the parties.

International Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir. 1974), cert. denied —— U.S. ——, 94 S.Ct. 2644, 41 L. Ed.2d 236, (validity of nationwide service of process under the 1934 Act not contested); Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir. 1972).

■■ To be sure, as Judge Friendly noted in *Leasco,* Congress, in providing for nationwide service of process, remains subject to the constraints of the Due Process clause of the Fifth Amendment.[6] Thus, the service authorized by statute must be reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense. *See e. g.* Hanson v. Denckla, 357 U.S. 235, 245, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956); Mullane v. Central Hanover B. & T. Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It is undisputed in this instance that the Peabody, Brown defendants received such notice through personal service in Massachusetts.

■ Appellees respond, however, by arguing that notice and an opportunity

to be heard is not sufficient, for "it is still necessary that defendants have the requisite 'minimal contacts' with *the State* which would exercise its jurisdiction over them. Hansen (sic) v. Denckla, 357 U.S. 235 [78 S.Ct. 1228, 2 L.Ed. 2d 1283] (1958)." Brief of Appellees at 15 (emphasis added). Mere statement of this contention reveals its fatal flaw: It is not the State of New York but the United States "which would exercise its jurisdiction over them [the defendants]." [7] And plainly, where, as here, the defendants reside within the territorial boundaries of the United States, the "minimal contacts," required to justify the federal government's exercise of power over them,[8] are present. Indeed, the "minimal contacts" principle does not, in our view, seem particularly relevant in evaluating the constitutionality of in personam jurisdiction based on nationwide, but *not* extraterritorial, service of process.[9] It is only the latter, quite simply, which even raises a question of the forum's power to assert control over the defendant.

### III

■ We turn next to whether venue is proper in the Southern District of

6. Congressional power to authorize nationwide service of process in cases involving the enforcement of federal law is beyond question. *See* American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts, Official Draft (1965) at 191; 3A J. Moore, Federal Practice ¶ 22.13 at 3100 n. 2 (2d ed. 1974).

7. Certainly this is true where, as here, federal jurisdiction is conferred by federal statute and not by the parties' diverse citizenship. We express no view on the relevant source of jurisdictional power—state or federal—where the latter is the case. *But compare* American Law Institute, *supra* at 191–95 *with* National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 329–333, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) (Black, *J.* dissenting).

8. In Hanson v. Denckla, *supra,* the Supreme Court enunciated the following raison d'être for the "minimal contacts" principle:
They are a consequence of territorial limitations on the power of the respective

States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had . . . "minimal contacts" with that State that are a prerequisite to its exercise of power over him.
Hanson v. Denckla, *supra,* 357 U.S. at 251.

9. Leasco Data Processing Equipment Corp. v. Maxwell, *supra,* is not to the contrary. In *Leasco,* the validity of nationwide service of process was *not* at issue, but rather, the propriety of true extraterritorial service of process under the 1934 Act—service of process on foreign citizens living abroad. Accordingly, when Judge Friendly referred to the "minimal contacts" line of cases, he did so in considering whether the foreign defendants (Fleming Ltd. and Chalmers, Impey & Co.) had sufficient connection with the United States to satisfy the "minimal contacts" required to legitimate extraterritorial service of process by a State.

New York—a question raised by the defendants-appellees below, but not reached by the district court. The portion of Section 27 of the 1934 Act already quoted provides for venue:

> in any  .  .  .  district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business
>
> .  .  .  .

In this instance, it is conceded that none of the defendants was either an "inhabitant" of New York or had been "found" in the Southern District. We need not decide, moreover, whether the Peabody, Brown firm "transacts business" in New York City because we believe it clear that "an act or transaction constituting the [alleged]· violation [has] occurred" in the Southern District of New York.

In Hooper v. Mountain States Securities Corp., 282 F.2d 195, 204–205 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), the Fifth Circuit concluded that "any use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in  .  .  .  [the] consummation [of the fraudulent scheme] is sufficient" for venue to lie in that district. More importantly, perhaps, because of appellees' assertion to the contrary, the *Hooper* court added that "it is [not] necessary that a false or deceptive or fraudulent paper be sent or statement made through the use of the mails or interstate communication facilities." Hooper v. Mountain States Securities Corp., *supra*, 282 F.2d at 204 (emphasis added). Indeed, in International Controls Corp. v. Vesco, *supra*, we held that the act of the transfer agent in mailing the spin-off dividend to the ICC shareholders from New York City, an essential element in the alleged fraudulently induced spin-off—although an act not fraudulent *per se*—was sufficient to establish venue in the Southern District of New York. *Id.* at 1347.

In this case, reading Mariash's complaint liberally, as we must in considering any motion to dismiss, *see* Scheuer v. Rhodes, —— U.S. ——, ——, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), he claims a violation of Section 10(b) [10] and Rule 10b–5 [11] through Peabody, Brown's alleged manipulation of the market in Viatron stock by deliberately enabling Burwick to reach the market with his large block of previously restricted shares before Mariash could. Critical to the success of this alleged scheme was the ability to control the timing of the respective sales—control made possible by the requirement that each shareholder of "letter stock" obtain an opinion letter, from Viatron's counsel, authorizing the transfer agent to remove the restrictive legend. So,

10. Section 10 of the 1934 Act provides, in pertinent part:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   .  .  .  .  .
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

11. Rule 10b–5, 17 CFR § 240.10b–5, provides, in relevant part:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   (a) To employ any device, scheme, or artifice to defraud,
   .  .  .  .  .
   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

once again, as in *Vesco*, the role of the transfer agent, located in New York City, is pivotal, and certainly a step of sufficient "importance" to satisfy the *Hooper* test for venue, which we adopted in *Vesco*.[12]

## IV

■ Finally, we must address ourselves to the passing claim, made by appellees for the first time on appeal, that Mariash "has failed totally to come forward with anything other than his own assertions which even suggest the defendant attorneys might have been guilty of wrongdoing." Supplemental Memorandum of Appellees at 3. We construe this claim as requesting us, in effect, to grant summary judgment[13] relief, although *neither* side had moved for it in the district court. It is well settled, however, that the lack of a proper adversary foundation for consideration of this request requires that we not entertain it. *See* Fountain v. Filson, 336 U.S. 681, 682–683, 69 S.Ct. 754, 93 L.Ed. 971 (1949); 6 J. Moore, Federal Practice ¶ 56.12 at 2243–46 (2d ed. 1974). Certainly, the opposing party should be given an opportunity in the district court to respond to a request for such drastic relief, which rests on the now unilateral and gratuitous assertion that the material facts are undisputed. This Court, needless to say, is not the proper forum for adducing a rebuttal. Accordingly, finding appellees' prayer for the relief sought here inappropriate, and there being no basis upon which to predicate dismissal of this complaint, we reverse and remand to the district court for further proceedings not inconsistent with this opinion.

12. We flatly reject appellees' argument that if we permit venue to rest on the mailing of a "release letter" to the transfer agent, then venue would be proper "in any jurisdiction to which such letter may be distributed." Suffice to say that, on the facts of this case, all we need hold is that venue is proper in the district in which the transfer agent is located. In short, the proverbial "slippery slope" simply does not arise on the facts here presented.

13. It is abundantly clear from the record below and the briefs on appeal that appellees did not then nor do they now attack the sufficiency of Mariash's Section 10(b) claim. Appellees' main brief glosses over this crucial, threshold question by stating:

It is not even necessary to decide if plaintiff's bizarre theory states a claim under the securities laws. The simple facts absolutely foreclose any finding of wrongdoing by defendants.

Brief of Appellees at 15. Indeed, in an effort to focus attention on the sufficiency of the complaint, we requested supplementary memoranda on this precise point. Once again, however, appellees went beyond the face of the allegations to a factual appraisal of the merits of Mariash's claim, arguing:

Should this Court elect to consider the sufficiency of the Complaint, we urge the evidence submitted by plaintiff fails to demonstrate any genuine issue of fact which merits the perpetuation of plaintiff's claim.

Supplemental Memorandum of Appellees at 3.

We should add that our independent review of the complaint satisfies us that Mariash has stated a claim under Section 10(b) of the 1934 Act. Although we have repeatedly held that mere negligence on the part of the defendants will not support a claim for damages under Section 10(b), *see e. g.* Lanza v. Drexel, 479 F.2d 1277, 1301–1302 (2d Cir. 1973) (en banc) and cases cited therein, Mariash's claim of deliberate market manipulation alleges far more than mere negligence by Peabody, Brown. Proof of those allegations is, of course, quite another matter, but one which we do not consider at this stage of the litigation.