**AMERICAN TRADE PARTNERS, L.P.,**

v.

**A–1 INTERNATIONAL IMPORTING ENTERPRISES, LTD.; John G. Cassidy, Sr.; Kevin P. Cassidy; Vincent G. Restivo; Francis R. Santangelo; and Premier International Importing Co., Inc.**

**Civ. A. No. 90–3992.**

United States District Court,
E.D. Pennsylvania.

Nov. 19, 1990.

Richard L. Scheff, Philadelphia, Pa., for plaintiff.

Sheldon Eisenberger, New York City, for Restivo and Premier.

Susan G. Kellman, New York City, for Santangelo.

William I. Aronwald, White Plains, N.Y., for Cassidys.

Joseph A. Lichtenthal, White Plains, N.Y., for A–1 Receiver.

## MEMORANDUM AND ORDER

DITTER, District Judge.

By orders dated November 5, 1990, and November 6, 1990, I refused the motions of defendants, Vincent G. Restivo, John G.

Cassidy, Sr., Kevin P. Cassidy, and Francis Santangelo to dismiss plaintiff's amended complaint and the motion of Francis Santangelo asserting that this court lacked *in personam* jurisdiction over him and was not an appropriate venue to adjudicate certain claims against him. This opinion will explain my reasons.

## I. Facts

Plaintiff, American Trade Partners, L.P., ("ATP") filed a ten count, amended complaint asserting both federal and state statutory claims and state common law claims. The complaint alleges that on March 1, 1988, American Trade Credit Corporation ("ATCC"), the predecessor of ATP, entered into an accounts purchase agreement with defendant A–1 International Importing Enterprises, Ltd. By this agreement, ATCC, later ATP[1], was to finance the operations of A–1 by purchasing accounts receivable invoices from A–1 at a discount. Those invoices related to goods sold by A–1 to the Home Shopping Network ("HSN"). HSN was directed to pay ATP or an ATP bank deposit account for the goods it received from A–1. Compl. at ¶ 15. Defendants Restivo and the Cassidys also signed personal guarantees in which they guaranteed A–1's performance under the accounts purchase agreement.[2] All were officers, directors, and shareholders of A–1. Defendant Santangelo was a shareholder and organizer of A–1.

ATP provided more than $16,000,000 to A–1 over a twenty-two month period. Compl. at ¶ 22. By December, 1989, A–1 owed ATP approximately $1,500,000 on twelve unpaid invoices. In order to work out the delinquency, ATP and A–1 negotiated a new arrangement whereby ATP was assigned the proceeds of three invoices totalling approximately $819,000 and received from A–1 a series of post-dated checks for the remaining amount of the debt. When the first check was deposited, payment was refused for a lack of sufficient funds. Payment on the second check was stopped.

The other checks were not submitted for payment. ATP has not been paid for the three invoices assigned to it pursuant to the work-out arrangement and has not received any other assets in place of the unpaid checks. ATP alleges that as of October 25, 1990, A–1 owes $2,055,198.57 plus interest at the rate of 18% per annum, attorneys' fees, and other costs. Compl. at ¶ 84.

As this work-out arrangement was being formalized, A–1 was experiencing severe internal difficulties which have since resulted in the initiation of two law suits in New York state courts. Santangelo and Restivo charge the Cassidys with mismanaging A–1 and with converting A–1 funds for their personal use. On the other hand, the Cassidys contend that Santangelo and Restivo improperly ousted them from the corporation and transferred A–1 assets to themselves and to a new corporation, defendant Premier International Importing Co., Inc., thereby dooming the work-out arrangement to failure. A receiver has been appointed to oversee the dissolution of A–1.

In its amended complaint, ATP alleges, *inter alia*, that in contravention of the accounts purchase agreement, defendants sold to ATP false invoices, representing goods either not shipped to HSN or goods not accepted by HSN upon shipment, compl. at ¶¶ 32–33; defendants received payments from HSN directly which should have been either forwarded to ATP or held in trust for ATP, *id.* at ¶¶ 38–41, but were converted by the individual defendants for their own use and for the use of third parties, *id.* at ¶¶ 42–43 and 51–53; defendants refused to remit payment for the outstanding debt, *id.* at ¶¶ 44–45; and defendants refused ATP's request to examine A–1's books and records, *id.* at ¶¶ 54–55. Restivo, the Cassidys, and Santangelo moved to dismiss various counts of the amended complaint pursuant to Fed.R. Civ.P. 9(b) and 12(b)(6).[3] Santangelo also

---

**1.** ATP asserts that ATCC assigned the agreement to it in May, 1988, when ATCC ceased to operate. Compl. at ¶ 21.

**2.** ATP also asserts that the guarantees were assigned to it. Compl. at ¶ 21.

**3.** On October 18, 1990, I granted defendants' motions to dismiss counts II, III, IV, V, VII, and

asserted that this court is without jurisdiction over his person and, alternatively, that venue cannot be laid in this district and the amended complaint must therefore be dismissed as to him under Fed.R.Civ.P. 12(b)(2) and (3).

## II. Motions for Summary Judgment

ATP contended that I should consider certain portions of defendants' motions to dismiss as motions for partial summary judgment under Fed.R.Civ.P. 56 because they rely on matters outside the pleadings for support. *See* Fed.R.Civ.P. 12(b). Restivo admitted and the Cassidys and Santangelo do not dispute that they relied, at least in part, on matters outside the pleadings which have been introduced in the New York courts and in conjunction with the motions to dismiss and with ATP's motion for a preliminary injunction. I, therefore, had no choice but to consider a number of their arguments under Rule 56.

Specifically, defendants [4] argued that the relationship between the parties is not controlled by the accounts purchase agreement but by two other documents dated February, 1989, and December, 1989, respectively. Based on the scant facts relating to this issue that had been introduced by the parties, I could not conclude as a matter of law that the subsequent agreements superseded the accounts purchase agreement.

Moreover, contrary to defendants' protestations, ATP raised a genuine issue of material fact regarding the assignment by ATCC of the accounts purchase agreement and the personal guarantees to ATP. For the time being, I had to assume that a valid assignment occurred and ATP stands in the shoes of ATCC with respect to the accounts purchase agreement and the personal guarantees and may properly sue for the alleged breach of those contracts. Inasmuch as defendants' motions for partial summary judgment on counts I, VI, VII, and VIII relied on these meritless contentions, I denied their motions.[5]

## III. Rule 9(b) Motions

Defendants raised a number of arguments pursuant to Fed.R.Civ.P. 9(b) in their attempt to convince me to dismiss the amended complaint. These arguments are grouped for purposes of discussion. First, defendants maintained that ATP's fraud allegations in the counts which assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (b), (c), and (d), (counts IV, V, III, and II, respectively), and in the substantive fraud count (count VII) do not meet the specificity requirement of Rule 9(b). Rule 9(b) provides: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The amend-

---

IX of the complaint. In that same order, however, I gave ATP leave to file an amended complaint to address the pleading inadequacies identified by the defendants. Additionally, I notified all parties that if ATP chose to file an amended complaint I would consider anew defendants' Rule 9(b) arguments without further briefing. A week later ATP filed a 107 page amended complaint which corrected the pleading errors of the original, *see infra* at 1297–1298. The amended complaint also includes an additional defendant, Premier International Importing Co., Inc., allegedly a corporation set up by Restivo and Santangelo, which received significant amounts of ATP's money that should have been held in trust for ATP by A–1 and the individual defendants. The amended complaint also includes a new count for tortious interference with contract. All of the defendants are charged with tortiously interfering with the ac-

counts purchase agreement, the personal guarantees, and a security agreement.

4. For the sake of brevity, I will attribute an argument raised by one of the individual defendants as if it had been raised by all the defendants. Thus, I shall not refer to the individual defendants by name, but rather I shall use the collective term "defendants." This designation, however, does not include Premier or A–1, which as of yet have not responded to the amended complaint.

5. Defendants made no other arguments with respect to counts I and VI. However, as for the other two counts, defendants raised contentions which do not rely on matters outside the pleadings. Therefore, I considered those arguments under the Fed.R.Civ.P. 9(b) and 12(b)(6) standards rather than under the summary judgment standard of Fed.R.Civ.P. 56.

ed complaint meets this threshold standard. It first provides a general description of the fraudulent acts and statements that allegedly give rise to liability. *See, e.g.,* compl. at ¶¶ 102–104. It then alleges which acts or statements were made by whom and when each act or statement was made.[6] *See, e.g., id.* at ¶¶ 105 and 106 (listing 46 overt acts performed by the various defendants in furtherance of the RICO conspiracy). The exhibits attached to the amended complaint further elucidate and support ATP's allegations. For these reasons, the amended complaint satisfied the pleading requirements of Rule 9(b).

■ The second group of arguments involved defendants' claims that the amended complaint does not allege that each defendant agreed to participate in the racketeering and fraudulent scheme and knew of the numerous acts which furthered it. Rule 9(b) permits "intent, knowledge, and other condition of mind of a person ... [to] be averred generally." As a result the amended complaint, and for that matter the original complaint, contains adequate averments of both agreement and knowledge, as well as more specific allegations of the nature and circumstances of this knowledge of the ends and means of the scheme to defraud. Compl. at ¶¶ 51–52, 97–98, 101–106, 109, and 128. Since defendants' Rule 9(b) arguments were without merit, I denied the motions to dismiss counts II, III, IV, V, and VII of the amended complaint.

## IV. Rule 12(b)(6) Motions

### A. RICO

■ Defendants essentially raised three contentions in their motions to dismiss counts II through V, the RICO counts. First, defendants argued that ATP does not have standing to pursue RICO claims. Second, they maintained that ATP's RICO enterprise allegation is legally and factually deficient. Third, they contended that the amended complaint does not properly al-

lege a "pattern of racketeering activity" as the term has been defined in recent years. *See, e.g., H.J., Inc. v. Northwestern Bell Telephone Company, Inc.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). I address each point *in seriatim.*

■ To satisfy RICO's standing requirement, a plaintiff must allege and later prove that it has been directly "injured in ... [its] ... business or property by reason of [a RICO] violation." 18 U.S.C. § 1964(c). A valid RICO injury stems from at least one of the "predicate acts" that underpin the section 1962 violation and not necessarily from the pattern of such acts. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). ATP asserts that its injury arose from the numerous predicate acts that comprised the pattern of racketeering activity detailed in the amended complaint. Additionally, when asserting a section 1962(a) violation, as ATP has done in count IV, a plaintiff must allege that its injury results from the use or investment of its money or property in an enterprise. ATP has done just that in the amended complaint. Paragraphs 112 and 113 clearly allege that:

> [e]ach of the defendants has received income, including that described ... in paragraphs 106(22) through 106(24), which is derived, both directly and indirectly, from the pattern of racketeering activity described in paragraph 109 of this Complaint and has used and/or invested, directly and indirectly, such income in the operations of the Enterprise and in the maintenance, furtherance, and operation of its affairs in violation of 18 U.S.C. § 1962(a).
>
> By reason of the above conduct, ... [ATP] has been injured, and is in danger of suffering additional injury in its business and property.

The monetary injury to ATP is graphically depicted at paragraphs 29, 51, 52, 57, 82,

---

**6.** The only plausible specificity argument that survives the filing of the amended complaint is that ATP in counts III, IV, V, and VII does not detail the fraudulent acts and statements. Rather, it relies on and incorporates by reference the

more detailed allegations of the first two counts. Incorporation by reference is, however, an acceptable, if not preferred, method of drafting a multi-count complaint.

106(13), and 106(20)–(24). Similarly, count V, contains an adequate section 1962(b) allegation of an injury to ATP's business or property because of the acquisition or maintenance of an interest in or control of an enterprise affecting interstate commerce. Compl. at ¶ 115. In sum, the amended complaint clearly depicts ATP's injury and the reasons why ATP believes it has been injured. Therefore, ATP has standing to assert civil RICO claims.[7]

■ In paragraph 96 of count II, ATP alleges that the association-in-fact of A–1, Premier, the Cassidys, Restivo, and Santangelo constituted an enterprise as defined in 18 U.S.C. § 1961(4).[8] Defendants contended that this is an improper pleading of a RICO enterprise because the alleged enterprise is made up of "persons,"[9] *i.e.,* the individual and corporate defendants, already subject to liability for the same acts that ATP claims were acts performed by the "enterprise." In its simplest terms, defendants' argument was that the RICO enterprise, and the individuals who made up that enterprise, were the same. This contention is without merit.

■ It is clear that as a matter of law a defendant cannot be both a "person" and the "enterprise" under section 1962(c). *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1358–59 (3d Cir. 1987); *B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628, 633–34 (3d Cir. 1984). This rule also applies when the enterprise is an association composed solely of a defendant corporation and its agents. *Newfield v. Shearson Lehman Bros.,* 699 F.Supp. 1124 (E.D.Pa.1988). Nevertheless, that rule does not apply in this case. Here, A–1, Premier, Restivo, the Cassidys, and

Santangelo are without question "persons" within the purview of section 1962(c). The alleged "enterprise," however, is not those six individuals, or any of them, but is an entity which they allegedly comprise. The enterprise is not them, but is the association-in-fact which they allegedly make up. Although the "persons" and the "enterprise" are not entirely separate, they differ in the same way that a baseball team is separate from its individual players. The six defendants were only an "enterprise" when they associated with each other. *See, e.g., Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165–66 (3d Cir.1989) ("nothing precludes an association of [defendants] for illicit purposes from constituting an enterprise."). ATP has properly plead the existence of an enterprise comprised of the association-in-fact of A–1, its four shareholders, and Premier.

■ Lastly, defendants vociferously contended that ATP has not and cannot adequately plead a "pattern of racketeering activity." A "pattern of racketeering activity" requires the commission of at least two predicate acts in a manner that shows both relationship and continuity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Defendants apparently conceded relatedness, but they maintained that ATP has not shown adequate continuity. "A party alleging a RICO violation demonstrates continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 109 S.Ct. at 2902.

ATP alleges a three-year[10] association of the defendants for the purpose of defraud-

---

7. Defendants did not raise a standing argument with respect to the other RICO claims. Even if they had done so, after a review of the amended complaint, at ¶¶ 107 and 110, I would have rejected such an argument.

8. Section 1961(4) defines an enterprise as any, "individual, partnership, corporation, association, or any legal entity, and any union or group of individuals associated in fact although not a legal entity."

9. Defendants' argument is derived from the language of section 1962(c), which provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

10. Defendants argued that the relevant time frame is not the three-year period as alleged in the amended complaint but is the last six or seven months of the contractual relationship, *i.e.,* between July, 1989, and February, 1990.

ing ATP of its money. Compl. at ¶¶ 97 and 98. A three-year period over which defendants allegedly engaged in this fraudulent conduct is certainly a substantial amount of time. *See Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989) (allegation of related predicate acts over a fourteen-month period satisfies pattern requirement). ATP also alleges that defendants committed more than forty-six overt acts over this three-year period to further its scheme to defraud. Compl. at ¶ 106. It asserts that these acts violated federal mail and wire fraud and securities statutes. *Id.* at ¶ 109. These acts fall within the definition of racketeering activity under section 1961(1). Additionally, these allegations, taken as true, supported ATP's contention that defendants' fraudulent conduct was their "regular way of doing business," *H.J., Inc.*, 109 S.Ct. at 2902, 2906, and that such conduct would have continued in the future, *id.* at 2902. *Accord Banks v. Wolk*, 918 F.2d 418, 422, 422–24 (3d Cir.1990). ("Predicate offenses committed in furtherance of a single criminal scheme can constitute a RICO pattern if the acts present the threat of future criminal activity.") Thus, ATP adequately pleads a "pattern of racketeering activity." Accordingly, defendants' motions to dismiss counts II, III, IV, and V were denied.

### B. Fraud

■ Defendants contended that count VII must be dismissed because it does not state a claim for fraud. They essentially raised two arguments: (1) ATP has not alleged that the misrepresentations were false when made; and, (2) any alleged misrepresentation on the part of the defendants is, at best, a breach of a promise to do something in the future which is not fraud. Neither argument was persuasive.

In order to state a cause of action for fraud, ATP must assert a false representation of a material fact that defendants knew or should have known was false and that defendants intended ATP to rely upon it. ATP must also state that it did, in fact, rely upon that false representation to its detriment. The amended complaint makes these allegations. Compl. at ¶¶ 128–132. ATP alleges that the fraudulent representations were made in the accounts purchase agreement and personal guarantees and that defendants knew at the inception of the contractual relationship that they would not comply with the terms of those contracts. The defendants asserted that their "faithful" performance under the contracts for the first fifteen months of the relationship makes plaintiff's contention illogical at best. This argument has two flaws. First, it is an argument that is bottomed on defendants' interpretation of the evidence. In effect, defendants wanted me to conclude, not on the basis of the allegations of the amended complaint, but on the evidence, scant as it is, introduced at the preliminary injunction hearing and in connection with the motions to dismiss, that their performance under the contract was "faithful" and therefore was not fraudulent. ATP contended that "any period in which the defendants appeared to be abiding by the terms of the Agreement ... [is] ... a 'lulling period,' in furtherance of their scheme to defraud. During this time, each transaction was designed to lull American Trade into a false sense of security. As such, they still constituted a vital part of the fraud." Plf.'s mem. in opp. at 10, n. 6; *see also* compl. at ¶¶ 106(9)–(13) and 129(k)–(m). When considering a motion to dismiss, I would not weigh the evidence. Plaintiff's allegation of fraud is proper and was not subject to dismissal.

■ Defendants' second contention was that the alleged misrepresentations connected with the signing of the accounts purchase agreement and personal guarantees were merely breaches of promises to act in the future and therefore not actionable fraud. In that regard, ATP maintained that this contention ignores the alle-

---

Defendants also contended that this six-month window is the operable time frame because the amended complaint alleges that the debt accrued and the majority of predicate acts occurred within that period. It seems, however,

that defendants ignore the allegations that both the scheme to defraud *and* the predicate acts which furthered it extended over the whole three-year period. Compl. at ¶¶ 97–98 and 106(1)–(13).

gations that each new invoice purchased "carr[ied] with it the representations of the original [accounts purchase] Agreement,.... Therefore, with each purchase of an invoice, the misrepresentations were repeated," plf.'s mem. in opp. at 9–10, and that each representation when made was intended to be false regardless of when performance was due. Thus, it was ATP's position that each invoice was a separate transaction and the relevant time frame for judging the state of mind of each defendant is not the date the accounts purchase agreement was signed but the date the funds were advanced on each invoice. Specifically, ATP contended that each time it funded one of the unpaid invoices, defendants did not intend to pay ATP the money they later received directly from HSN even though they agreed to be bound by the terms of the accounts purchase agreement which included a promise to remit such payments received at a later date to ATP. The essence of fraud is in the misrepresentation that occurs when a defendant makes a bargain with no intention of living up to it. *See, e.g., College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 206 (1976) ("Statements of intention, ..., which do not, when made, represent one's true state of mind are misrepresentations known to be such and are fraudulent."). ATP's pleading asserts that defendants had no intention of "living up" to their end of the deal. Accordingly, the motions to dismiss count VII for failure to state a claim for fraud were dismissed.

### C. Conversion [11] and Breach of Trust

▮ In counts VII and VIII, ATP claims that money held in trust for it was converted, that is, wrongfully and knowingly taken and distributed by and to the defendants and others. Compl. at ¶¶ 42, 45–47, 131 and 134–138. The individual defendants moved to dismiss these claims because they contended that they were not parties to the accounts purchase agreement, they did not owe a fiduciary duty to ATP to protect its money held by A–1, and ATP did not plead and cannot prove the existence of a constructive trust in order to charge them with conversion of its money and breach of that resulting trust.[12]

Without question, only A–1 and ATP are parties to the accounts purchase agreement, but this does not let Restivo, the Cassidys, and Santangelo off the hook. The amended complaint contains allegations that under paragraph 4 of the accounts purchase agreement, A–1 and Restivo and the Cassidys expressly agreed to hold the amounts paid to A–1 by HSN in trust for ATCC and subsequently ATP. Compl. at ¶¶ 36, 129(e) and 134. Furthermore, Restivo and the Cassidys, as guarantors, each agreed personally to "hold amounts [for ATP] in accordance with the [accounts purchase] Agreement." Plf.'s exhibit D. ATP argues persuasively that the accounts purchase agreement and the personal guarantee require Restivo and the Cassidys to hold ATP's money in trust for ATP's benefit. ATP's pleading adequately establishes the necessary elements for the creation of an express trust. Thus, Restivo and the Cassidys must face liability for the alleged conversion of ATP's assets.

▮ ATP argued that given the accounts purchase and security agreements' express terms and their implied meaning, Restivo, Santangelo, and the Cassidys are, as a matter of equity, personally bound by a constructive trust to return ATP's money or stand accountable for its conversion. A constructive trust is not a trust in the ordinary sense of the term but is simply an equitable remedy designed to prevent unjust enrichment. *Partrick & Wilkins Co. v. Reliance Insurance Co.*, 500 Pa. 399, 456 A.2d 1348 (1983). ATP alleges that defendants knew that once A–1 received funding from ATP, they were not allowed

---

**11.** ATP's claim for conversion is included in its fraud claim in count VII. In its memorandum in opposition to the motions to dismiss, ATP combined the conversion claim with the breach of trust claim in count VIII. I will also join the two for the purposes of my analysis.

**12.** Restivo and Santangelo also raised other arguments with respect to counts VII and VIII. These arguments I discussed and dismissed in the summary judgment section of this memorandum, *see supra* at 1297.

to take for their own use any of the money HSN sent to A–1 instead of to ATP. Compl. at ¶¶ 129(e), 131, and 134. If it is as ATP alleges in its count for breach of trust, count VIII, the individual defendants seem to be unjustly enriched to the detriment of ATP, which gave money to A–1 with the expectation and right to receive money from HSN in return. Therefore, I denied the motions to dismiss counts VII and VIII.

### D. Fraudulent Conveyance

The arguments raised by defendants in their motions to dismiss the original complaint have been mooted by ATP's amended count IX, which, in any event, sufficiently alleges a claim to void a fraudulent conveyance by A–1 to the individual defendants and Premier.

### V. Rule 12(b)(2) Motion

■ Santangelo strenuously contested this court's jurisdiction over him. Despite numerous memoranda and exhaustive discovery concerning Santangelo's contacts with this forum, the issue was not so difficult as one might think from the extensive briefing on the subject. The two basic questions were whether or not there is jurisdiction over Santangelo with respect to the RICO claims and whether or not there is personal jurisdiction over Santangelo with respect to ATP's state claims.

■ Subject matter jurisdiction over the RICO claims is based on a federal question, 28 U.S.C. § 1331. Therefore, I had to look to federal law to evaluate the personal jurisdiction issues raised here. The personal jurisdiction sections of the RICO statute are found in sections 1965(a) and (d).[13] Section 1965(d) provides for "nationwide service of process" on RICO defendants. *Soltex Polymer Corp. v. Fortex Industries,* 590 F.Supp. 1453, 1458 (E.D.N.Y.1984), *aff'd* 832 F.2d 1325 (2d Cir.1987). It has become well-established that " '[w]here such nationwide service of process is authorized, a federal district court's jurisdiction is "coextensive with the boundaries of the United States, [and] due process requires only that a defendant in a federal suit have minimum contacts with the United States." ' " *Soltex,* 590 F.Supp. at 1458 (quoting *Clement v. Pehar,* 575 F.Supp. 436, 438 (N.D.Ga.1983) (quoting *FTC v. Jim Walter Corp.,* 651 F.2d 251, 256 (5th Cir.1981))).[14] It is clear that San-

---

13. Section 1965(a) provides that:

> Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

Section 1965(d) provides that:

> All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

14. *See also Mariash v. Morrill,* 496 F.2d 1138 (2d Cir.1974); *Anchor Glass Container Corp. v. Stand Energy Corp.,* 711 F.Supp. 325, 330–31, n. 10 (S.D.Miss.1989); *LaSalle National Bank v. Arroyo Office Plaza,* 1988 WL 23824 1988 U.S. Dist. Lexis 2025 (N.D.Ill.1988); *Entek Corp. v. Southwest Pipe & Supply Co.,* 683 F.Supp. 1092 (N.D.Tex.1988); *Soltron Incorporated v. McAngus,* 1987 WL 12832 1987 U.S.Dist. Lexis 4905 (S.D.N.Y.1987); *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.,* 657 F.Supp. 1040 (S.D.N.Y.1987); *Hirt v. U.M. Leasing Corp.,* 614 F.Supp. 1066 (D.Neb.1985). No case in the Third Circuit has addressed this issue in the RICO context. However, in *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290 (3d Cir.1985), the court found that where a federal statute provided for nationwide service of process, state law is not relevant and personal jurisdiction is determined solely by reference to federal law. The court further explained that the true issue is the "situs of the requisite minimum contacts.... Under the national contacts theory, the proper inquiry in determining personal jurisdiction in a case involving federal rights is one directed to the totality of a defendant's contacts throughout the United States." *Max Daetwyler,* 762 F.2d at 290. Two justifications have been proposed for the "national contacts theory." The first is the sovereign approach, which is based on the proposition that since the sovereign in federal question cases is the United States, the relevant contacts inquiry focuses on the nation as a whole rather than on a particular state. *See, e.g., FTC v. Jim Walter Corp.,* 651 F.2d 251, 256–57 (5th Cir. 1981). The validity of this approach has been questioned in recent years. *See, e.g., Burstein v. State Bar of California,* 693 F.2d 511, 515 n. 8 (5th Cir.1982) (discussing the effect of *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 & n. 10, 102 S.Ct. 2099, 2100, 2104 & n. 10, 72 L.Ed.2d 492 (1982), on *Jim Walter* ). The second and more viable basis for the national contacts theory relies on the service provisions of Fed.R.Civ.P. 4(f). *See, e.g., Point Landing, Inc. v. Omni Capital Int'l*

tangelo, a citizen and resident of New York, has the minimum contacts with the United States to satisfy the requirements of due process. Therefore, this court has personal jurisdiction over him under section 1965.[15]

■ Since I found that this court has personal jurisdiction over Santangelo with respect to the federal statutory claims and that the state claims are pendent in nature, *i.e.*, that both federal and state claims arise from a common nucleus of operative facts, it follows this court has pendent jurisdiction over those claims and personal jurisdiction over Santangelo with respect to them. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## VI. *Rule 12(b)(3) Motion*

■ In my order of July 26, 1990, at ¶ 3, I found that this district was a proper venue for adjudication of ATP's state law claims against defendants and for adjudication of ATP's federal claims against all defendants except Santangelo. The sole remaining issue was whether or not this is a proper venue for adjudication of ATP's RICO claims against Santangelo. To resolve this issue, I looked to the general federal venue provision, 28 U.S.C. § 1391(b), to the so-called co-conspirator venue theory, *see Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985), and to the RICO venue provision, 18 U.S.C. § 1965.

■ Under the provisions of section 1391(b) [16] venue is in this court. The RICO claims arose in this district. Those claims are grounded in part upon the accounts purchase agreement and its allegedly fraudulent breach by Santangelo. The agreement clearly states that "all transactions thereunder shall be deemed to be consummated in the Commonwealth." Plf's exhibit A, ¶ 4. This expression must mean that a claim premised upon a transaction, which is deemed to have occurred here, necessarily arose here. The amended complaint specifies a number of racketeering acts committed by defendants in general and Santangelo in particular that either occurred in this district or were deemed to occur here.[17] Compl. at ¶¶ 106(8)–(33). A

---

*LTD.*, 795 F.2d 415 (5th Cir.1986) (per curiam) (en banc) *aff'd sub nom. Omni Capital Int'l LTD. v. Rudolf Wolff & Co., LTD.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1314 (9th Cir.1985). Rule 4(f) sets the territorial limits within which service of process will be effective on a party. "This rule limits the district court's ability to obtain personal jurisdiction over a defendant to jurisdiction in the state within which the district court sits, *unless* a statute of the United States confers territorial limits beyond the boundaries of that state." *Vigman*, 764 F.2d at 1314 (emphasis added). As I noted above, section 1965, is such a statute. Thus, the *Point Landing* and *Vigman* approach is on firmer ground and has persuaded me that the national contacts test is appropriate in the RICO context.

15. Santangelo contended that before this court exercised its jurisdictional power over him, I first must have found that the "ends of justice" required it. Santangelo relied on the following language from section 1965(b) for support for this unavailing argument:

In any action under section 1964 of this chapter in any district court ... in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for

that purpose may be served in any judicial district of the United States by the marshal thereof.

Santangelo has confused personal jurisdiction with venue. Section 1965(b) is a venue provision that only comes into play if the court first finds that jurisdiction is proper under section 1965(a) and (d), as in this instance, and then only if those sections do not also permit venue to be laid in that forum. *See Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040, 1055 n. 10 (S.D.N.Y.1987). However, to the extent that the jurisdiction and venue, both in general and within section 1965, are related concepts, Santangelo's argument merits discussion. I will address it in the venue section of this memoranda, *infra* at 1304–1305.

16. Section 1391(b) states that:

a civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

17. Santangelo argued that if any acts occurred or are deemed to occur here, he performed such acts in his official capacity only and is thus immune from personal liability for those acts. Santangelo relied on the fiduciary shield doctrine for support of this claim. According to

forum selection clause, such as the one in paragraph 4 of the accounts purchase agreement, is a significant factor in determining venue and ordinarily will be accorded great weight. *See Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988). Thus, because I found the RICO claims arose here I also found that this forum is a proper venue to hear them.

 Moreover, the RICO claims against Santangelo are properly laid here because the forum contacts of his co-defendants can be attributed to him for venue determination purposes.[18] Under the co-conspirator venue theory, "where an action is brought against multiple defendants alleging a common scheme of acts or transactions in violation of ... [federal] ... statutes, so long as venue is established for any of the defendants in the forum district, venue is proper as to all defendants." *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985) (applying the theory in a securities fraud action). *See also Arpet, Ltd. v. Homans*, 390 F.Supp. 908, 911–12 (W.D.Pa.1975) (securities fraud).[19] The amended complaint adequately alleges the existence of a conspir-

acy, compl. at ¶ 97, the plan and purpose of the conspiracy, *id.* at ¶ 98, the roles of the defendants in the conspiracy, *id.* at ¶¶ 99–104, the performance of substantial acts in furtherance of the conspiracy in the forum state by Santangelo and his co-conspirators, *id.* at ¶¶ 105–106, and Santangelo's knowledge and awareness of those acts, *id.* at ¶¶ 97–98 and 106–107. *See also In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 398, 411 n. 15 (E.D.Pa.1981) (quoting *Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir.1980) (quoting *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F.Supp. 559, 564 (M.D.N.C.1979))). These allegations show the nexus between Santangelo, his co-conspirators, and their acts, and the nexus between his co-conspirators, their acts, and Philadelphia. These allegations led me to conclude that venue is properly laid here.

 Lastly, section 1965(b) would permit this court to host this action against Santangelo because the "ends of justice" require it. This is so, despite the fact that the Southern District of New York would also be an appropriate forum to hear this case.[20] *See, e.g., Miller Brewing Co. v.*

---

this doctrine, "if an individual has contacts with the state only by virtue of his acts as a fiduciary of a corporation, he may be personally shielded from the exercise of jurisdiction [or venue] in that state on the basis of that conduct." *Bulk Oil (USA) Inc. v. Sun Oil Trading Co.*, 584 F.Supp. 36, 40 (S.D.N.Y.1983). Were this not a RICO case, Santangelo might have been correct. However, the fiduciary shield doctrine has been found not to apply to RICO claims. *Rolls–Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F.Supp. 1040 (S.D.N.Y.1987); *Soltex Polymer Corp. v. Fortex Industries*, 590 F.Supp. 1453 (E.D.N.Y.1984), *aff'd* 832 F.2d 1325 (2d Cir.1987). In *Rolls–Royce* and *Soltex*, the courts reasoned that the doctrine is solely a creature of state law and should not apply to venue determinations under section 1965. Moreover, both courts and the court in *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285 (E.D.Wis.1985), found the doctrine, even if applicable, to be inappropriate in situations where it is alleged that the defendant utilized the corporate forum to commit fraud. Therefore, Santangelo cannot hide behind the corporate shield and he must face liability for his alleged misdeeds.

**18.** ATP raised this co-conspirator argument in its jurisdictional contentions. The argument, however, has equal force in the venue context.

**19.** The co-conspirator theory is equally, if not more, appropriate in the RICO context than in securities fraud litigation. Section 1965(a) provides that venue may be found in the district where the defendant "has an agent." The co-conspirator theory is bottomed on agency theory. It is said that each co-conspirator acts as the agent for the others and any co-conspirator's act in a district is attributable to the other co-conspirators. *Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher*, 635 F.Supp. 15, 18 (E.D.Pa.1985) ("When co-conspirators have sufficient contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege that there is not sufficient contacts; co-conspirators are agents for each other.").

**20.** Santangelo, relying on *Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788 F.2d 535, 539 (9th Cir.1986), argued that section 1965(b) can only be used where there is no other forum having jurisdiction over all the alleged defendants. *Butcher's Union* is inapposite, however. The court, there, improperly reads language of limitation into the statute. Nowhere in section 1965(b) does it say that there must not be some other appropriate forum. The statute is silent on that issue. If Congress had intended to limit

*Landau,* 616 F.Supp. 1285, 1290 (D.Wis. 1985) (finding "ends of justice" require venue under section 1965(b) even though venue would be proper as to all defendants in another district, due to extraordinary delay that would ensue if action dismissed or transferred.). Were I to transfer this case, already five months old and laboring with delay, to the New York court, further delay would necessarily ensue. Moreover, the proceedings here have advanced considerably and it would be an enormous waste of time and resources of both the court and the parties to transfer this case to New York. Santangelo, and the other defendants, have been well represented here and I do not see why that will not continue. I recognize that New York is, perhaps, a more convenient forum for Santangelo and his co-defendants, however, their gain pales in comparison to the harm that would be suffered by ATP upon such a transfer.[21] As the court in *Miller Brewing* put it, "[t]herefore, were § 1965(b) the only means of maintaining the action in this district, the Court would find that the ends of justice require the presence" of all the defendants. *Id.* at 1291. The ends of justice require Santangelo's presence in this court.

## VII. Conclusion

After reviewing the parties' evidentiary submissions, I denied Restivo's and Santangelo's motions for summary judgment on counts I, VI, VII, and VIII. I found that the allegations in counts II, III, IV, V, and VII of the amended complaint meet the specificity requirements of Fed.R.Civ.P. 9(b), and thus, I denied defendants' motions to dismiss those counts. Additionally, I found the RICO and fraud counts are adequately plead. Defendants' motions to dismiss counts II through V and VII were

denied. ATP's conversion, breach of trust, and fraudulent conveyance counts also pass muster under Fed.R.Civ.P. 12(b)(6), so the motions to dismiss counts VII, VIII, and IX will be denied. Finally, I found that this court has personal jurisdiction over Santangelo and is an appropriate venue to hear this case. Accordingly, Santangelo's motions to dismiss the amended complaint for failure of this court to have jurisdiction over him and to be a proper venue with respect to him were denied.

---

subsection (b) it could have done so. I refuse to imply terms into the plain language of a statute that was passed by Congress. Moreover, the *Butcher's Union* court elevates what certainly should be *a* factor in the ends of justice determination into the *sole* factor. *See Miller Brewing,* 616 F.Supp. at 1290 ("[I]t should not be the sole consideration, especially where transferring the case would result in extraordinary delay or some other extreme prejudice against the plaintiff's interests."). The term "ends of justice"

implies a more fluid decision-making process, one that is not bound by rigid threshold factual determinations. The *Miller Brewing* multi-factor approach permits such flexibility.

**21.** On July 26, 1990, I denied defendants' motion to transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).