AMERICAN TRADE PARTNERS, L.P.

v.

A–1 INTERNATIONAL IMPORTING EN-
TERPRISES, LTD., John G. Cassidy,
Sr., Kevin P. Cassidy, Vincent G. Resti-
vo, Francis R. Santangelo, and Premier
International Importing Co., Inc.

Civ. A. No. 90–3992.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 1991.

Richard L. Scheff, Philadelphia, Pa., for plaintiff.

Sheldon Eisenberger, Joseph Zelmanovitz, New York City, for Premier & Restivo.

Susan G. Kellman, New York City, for Santangelo.

William I. Aronwald, White Plains, N.Y., for Jack Cassidy & Kevin Cassidy.

Joseph A. Lichtenthal, White Plains, N.Y., for A–1 as receiver.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Before me are the motions of defendants[1], John G. Cassidy, Sr., Kevin P. Cassidy, Vincent G. Restivo, Francis R. Santangelo, and Premier International Importing Co., Inc., to dismiss plaintiff's amended complaint. In support of their motions, defendants raise a variety of arguments. With two notable exceptions, their claims are without merit. Defendants correctly assert that plaintiff's count X, a claim for tortious interference with contracts, does not state a claim for relief, and Premier is correct that this court is not a proper venue for adjudication of the state law claims asserted against it. Therefore, defendants' motions to dismiss will be granted in part and denied in part. I will, however, permit plaintiff to amend count X of its complaint. The state law claims against Premier will be dismissed.

### I. Facts

The facts as alleged were reviewed with great specificity in my previous memorandum dated November 16, 1990. I will, therefore, only briefly summarize them here.

American Trade Partners, L.P., ("ATP"),[2] entered into an accounts purchase agreement and a security agreement with defendant A–1, to finance the operations of A–1 by purchasing accounts receivable invoices from A–1 at a discount. Restivo and the Cassidys also signed personal guarantees that the terms of the accounts

---

1. For the sake of brevity, I will attribute an argument raised by one of the defendants as if it had been raised by all the defendants. Thus, in most circumstances, I shall not refer to the individual defendants by name, but rather I shall use the collective term "defendants." However, Premier raises a number of arguments that are pertinent only to the claims asserted against it. When discussing the merits of those arguments, I shall refer to Premier by name. Additionally, the "defendants" designation does not include A–1, because it has not responded to the amended complaint.

2. Actually, ATP's predecessor, American Trade Credit Corporation ("ATCC"), signed the agreements with A–1. ATP asserts that the agreements were assigned to it by ATCC in May, 1988, when ATCC ceased to operate. Compl. at ¶ 21.

purchase agreement would be fulfilled. The purchased invoices related to goods sold by A–1 to the Home Shopping Network ("HSN"). These agreements allegedly required, *inter alia,* HSN to pay ATP or an ATP bank account for the goods it received from A–1. Compl. at ¶ 15. ATP contends that on a number of occasions in the latter half of 1989, HSN paid A–1 instead, and A–1 and the other defendants failed to return that money to ATP or to hold it in trust for the benefit of ATP. ATP asserts that defendants converted that money to their own use and now owe it approximately $2,050,000 plus interest, attorney's fees, and other costs.

On October 18, 1990, I granted defendants' motions to dismiss a number of the counts in ATP's original complaint. I permitted ATP to amend its complaint to address the pleading inadequacies. At that time, I informed defendants that no further briefing on their motions would be required if ATP chose to file an amended complaint and I would consider their motions anew. ATP then filed a ten count, 107 page amended complaint. By orders dated November 5, 1990, and November 6, 1990, I refused defendants' motions to dismiss the amended complaint. Two weeks later, I issued an opinion explaining my reasons for doing so. *American Trade Partners, L.P. v. A–1 International Importing Enterprises, Ltd.,* 755 F.Supp. 1292 (E.D.Pa. 1990). In the November orders, I permitted defendants to file new motions to dismiss the amended complaint. I cautioned defendants not to repeat any argument that I had already analyzed and rejected in my prior memorandum.

For the most part, defendants followed that directive.[3] The following contentions are without merit for the reasons explained in my first memorandum:

(1) ATP's fraud allegations in the counts which assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (b), (c), and (d), (counts IV, V, III, and II, respectively), and in the substantive fraud count (count VII) do not meet the specificity requirement of Fed.R.Civ.P. 9(b);

(2) ATP improperly alleged a "pattern of racketeering activity";

(3) ATP failed to allege that individual defendants knew that the alleged predicate acts were part of a pattern of racketeering activity;

(4) ATP's section 1962(c) claim is deficient because the defendants charged with violating this section are the same individuals who form the alleged enterprise;

(5) ATP does not have standing to assert a claim under sections 1962(a) and (b);

(6) Counts I and VI fail because the individual defendants are not parties to the accounts purchase agreements and the security agreement;

(7) The alleged existence of the work-out agreement preempts any breach of contract claims arising out of the accounts purchase agreement and limited guarantees;

(8) Count VII does not meet the specificity requirement of Rule 9(b);

(9) Count VIII does not state a claim for relief; and

(10) Count IX does not state a claim for relief.

## II. RICO

### A. Enterprise

■ In paragraph 96 of the amended complaint, ATP charges that "the association in fact of defendants A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo constituted an enterprise" as defined in the RICO statute, 18 U.S.C. § 1961(4). Defendants contend that their association cannot be considered as an enterprise for RICO purposes. They argue that because the Cassidys were excluded from the operations of A–1 and Premier was not formed until sometime in January, 1990, no enterprise could exist that includes both the Cassidys and Premier as its

---

**3.** To the extent that they did not, I attribute their failure to the fact that defendants filed their second motions before I issued my memorandum explaining my reasons for refusing their first motions.

members. Thus, they maintain the amended complaint does not allege a single, ongoing enterprise, as required, but alleges, at best, two conspiracies neither of which constitutes, or is alleged to constitute, a viable RICO enterprise. Even if I were to assume, *arguendo*, that there was no communication or cooperation among or between the Cassidys and the other defendants after mid-January, 1990, the amended complaint adequately alleges the existence of a single RICO enterprise comprised of all the defendants.

■ An "enterprise" under the RICO statute "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is characterized by: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in the conduct of the pattern of racketeering activity. *United States v. Riccobene*, 709 F.2d 214, 221 (3d Cir.), *cert. denied, sub nom. Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983) (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–2529, 69 L.Ed.2d 246 (1981)). The relevant question here is whether or not the amended complaint describes an organization with those characteristics. It does. ATP alleges an organization conducting a pattern of racketeering activity over a three-year period. It also alleges this organization was comprised of the same core group of defendants, motivated by a desire to defraud ATP, and marked by an internal structure that remained constant over the entire period.

### 1. Common Purpose

■ Defendants assert that they did not have the requisite common purpose after the exclusion of the Cassidys. They contend that after that time there was no agreement among the defendants to continue the activity of the alleged enterprise. This argument misses the point. The important issue is whether or not the enterprise continued with the common goal to defraud ATP out of its money, not whether the individual members of the enterprise agreed on every act to accomplish that goal. *United States v. Elam*, 678 F.2d 1234, 1247 (5th Cir.1982) (single conspiracy where multiple acts and multiple participants were "merely aspects of single common goal" to import marijuana). With respect to ATP, the enterprise's goal never changed: defraud ATP out of its money for personal enrichment. *See* Compl. at ¶ 98.[4] Only the plan to use Premier, instead of A–1, to carry out the scheme to defraud changed. Each and every act of the scheme may not have been agreed upon, but the overarching goal to bilk ATP out of its funds was agreed to by everybody. The amended complaint sufficiently alleges that the common goal vis-a-vis ATP remained the same before and after the formation of Premier and the exclusion of the Cassidys.

### 2. Continuity of Structure and Personnel

■ Defendants next assert that the second element for a RICO enterprise, continuity of structure and personnel, is missing. In a nutshell, the defendants' argument is that once the membership of the enterprise changed, it ceased to exist. This is not the case. In *Riccobene*, the Third Circuit stated, as cited approvingly by defendants, *see* Restivo mem. at 7, that although a RICO enterprise must " 'function as a continuing unit. . . .' This does not mean that individuals cannot leave the group or that new members cannot join at a later time." *Riccobene* at 223 (quoting *Turkette* 452 U.S. at 583, 101 S.Ct. at 2528–2529).[5] A simple change in membership, as

---

**4.** Paragraph 98 provides that:

It was the overall plan and purpose of the conspiracy for A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo and Santangelo to commit, and agree to commit various acts of fraud, conversion, breach of contract, breach

of trust and theft, among others described in this Complaint for the purpose of enriching themselves and of depriving . . . [ATP] . . . of money and property due and owing it, . . . .

**5.** *See also United States v. Kragness*, 830 F.2d 842, 856 (8th Cir.1987) ("That some changes in

long as it does not disrupt the structure or mechanism for "controlling and directing the affairs of the group on an ongoing, rather than an ad-hoc, basis," *id.* at 222, and as long as a core of members remains in the organization, *id.*, does not destroy the enterprise.

ATP alleges a clearly defined organizational structure and a continuity of associates that survived the Cassidys' departure. A-1 and then Premier were the vehicles through which the money laundering scheme and scheme to defraud were executed. Compl. at ¶¶ 99–100. When A-1 could no longer be used effectively, Premier was formed to continue the alleged fraud. Compl. at ¶¶ 106(38)–(45). Decision making authority was well-established. Restivo served as a director, officer, and shareholder of both A-1 and Premier. He is alleged to have been responsible for ordering goods from overseas at the direction of Kevin Cassidy and Santangelo, arranging for shipment of the goods to HSN, submitting requests for reimbursement of personal expenses, and authorizing the payment of money to ATP, to the shareholders, and to third parties. Compl. at ¶ 7. He allegedly exercised similar power at Premier. Compl. at ¶ 8.

Santangelo's primary role was to foster A-1's and Premier's relationship with HSN, the companies' primary buyer of goods. Compl. at ¶¶ 9–10. He also was given the responsibility of assuring HSN's prompt payment on A-1 invoices. *Id.*

Jack Cassidy "directed … [A-1's] … financial affairs, supervised profit distributions, submitted, oversaw and approved payments to third parties for his [and other's personal expenses] … and controlled, in part, all disbursements of A-1 money." Compl. at ¶ 5. Most important, it is alleged that Jack Cassidy was the primary liaison

between A-1 and ATP. *Id.* When he left the organization, that role fell to Restivo, in large part, and to Santangelo and to Restivo's counsel, to a lesser degree. Compl. at ¶¶ 106(34), (35), (38) and (39).

Kevin Cassidy, like Santangelo, spent most of his time working with HSN to obtain goods for it and to obtain payment for those goods for A-1. Compl. at ¶ 6. He also authorized distributions of A-1 money to the shareholders, creditors, and third parties. *Id.* His jobs were later performed by Restivo and Santangelo. Compl. at ¶¶ 106(36), (37), (40), and (41).

The amended complaint is specific in describing the structure and organization of the enterprise and the tasks each member performed to further its objectives. The loss of the Cassidys and the creation of Premier did not disrupt the functioning of the enterprise to deprive it of its status. In short, whatever functions the Cassidys and A-1 performed, later were performed adequately by Restivo, Santangelo, and Premier. The leopard kept its spots.

### 3. "Separate and Apart"[6]

An enterprise related to, yet "separate and apart" from, the predicate acts is alleged here, satisfying the third requirement for a RICO enterprise. A-1 and Premier did not merely engage in the allegedly improper acts, but they performed perfectly legitimate business activity during that period of time. The individual defendants also performed legal as well as the alleged illegal activity. This organization had and continues to have "an existence beyond that which is necessary to commit each of the acts charged as predicate racketeering offenses." *Riccobene* at 224. Even if A-1 and Premier did no legitimate business, the mere coordination necessary to pull off such an elaborate fraud with the numerous

---

structure and personnel occur does not mean that there is no mechanism for continuing direction of group affairs; both the structure and the personnel of an enterprise may undergo alteration without loss of the enterprise's identity as an enterprise."); *United States v. Continental Group, Inc.*, 456 F.Supp. 704, 715–16 (E.D.Pa. 1978), *aff'd* 603 F.2d 444 (3d Cir.1979), *cert. denied* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

6. In *Riccobene,* the court stated that "the third and final element in establishing the enterprise is that the organization must be 'an entity *separate and apart* from the pattern of activity in which it engages.'" *Id.* at 223 (quoting, *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528–2529) (emphasis added).

predicate acts and participants which furthered it would satisfy the separate existence requirement. *Id.*

The amended complaint adequately alleges the existence of each of the three elements necessary to establish a RICO enterprise.

### B. Lulling

■ In its RICO and fraud counts, ATP alleges that A–1, Jack Cassidy, Kevin Cassidy, Restivo and Santangelo "lulled … [it] … into a false sense of security that it was dealing with honest businessmen" by abiding by the terms of the various contracts for over a year before they converted ATP's money to their own use. Compl. at ¶¶ 106(8)–(13) and 129(k)–(m). ATP alleges that, for example, A–1's payment on numerous invoices in 1987 and 1988 was for the "specific purpose" of lulling ATP into a false sense of security so it would be easier to defraud ATP out of its money in 1989 and 1990. Compl. at ¶ 106(9). The individual defendants argue that if I were to accept this "lulling" theory, a plaintiff could improperly convert any legitimate business relationship marked by years of faithful performance into a RICO case merely by alleging that the early years were a precursor to unscrupulous behavior and were intended to lull the plaintiff into a false sense of security. In certain instances, there is no doubt that they could be correct. Whether or not that is the case, however, ultimately depends upon the evidence, not the complaint's allegations. If the plaintiff alleges, as ATP has done here, that one act or many acts were performed for the specific purpose to defraud it, even though those acts appear on their face to be legitimate, that allegation is sufficient to withstand a motion to dismiss.

### C. Miscellaneous Contentions

■ Premier raises a myriad of arguments concerning its alleged RICO violations. In brief, Premier asserts that the RICO allegations lack the specificity required by Fed.R.Civ.P. 9(b), its formation was not a fraudulent act, and any payment of money or transfer of an account to it was legitimate. These arguments are without merit.

Rule 9(b) provides: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The amended complaint meets this threshold pleading standard. It first provides a general description of the RICO conspiracy and the acts which furthered it. Compl. at ¶¶ 86–105. Premier's role in the scheme to defraud is explained in general terms, compl. at ¶¶ 88, 100, and 103, and specific acts of misconduct are alleged, compl. at ¶¶ 103, 105(h), 105(i), 105(*l*), 105(q), 106(42)–(46). ATP shows how Premier's activity furthered the money laundering scheme and the scheme to defraud in paragraphs 103, 105(i), 105(*l*), 106(43), 106(46), and 107. ATP also alleges that Premier agreed to participate in the enterprise and the acts and omissions which furthered it. Compl. at ¶¶ 97, 105(i)–(*l*), and 106(43)–(46). The complaint withstands Premier's specificity challenge.

Premier's last two contentions are not ripe for resolution at this stage of the proceedings. These arguments depend upon the evidence not upon the allegations of the complaint. The formation of Premier and the transfer of money and accounts to it from A–1 may turn out to be a perfectly legitimate business activity, but that determination would require a review of the evidence. For now, I must assume that those acts are fraudulent, because ATP alleges that they are. Premier's arguments to dismiss the amended complaint on these grounds are rejected.

### III. *Fraudulent Conveyance*

■ In count IX, ATP asserts that in violation of New York's fraudulent conveyance statutes, N.Y.Debt. & Cred.Law §§ 273, 274, 275, and 276,[7] A–1 transferred

---

7. These statutes provide:
  § 273 Conveyances by insolvent
    Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

its assets for inadequate consideration, compl. at ¶ 141, at a time when it was insolvent or near insolvency, compl. at ¶ 142, and when it owed money to ATP, compl. at ¶ 143, to defendants [8] who took those assets with the intent to defraud ATP, compl. at ¶¶ 144–145. ATP seeks the return of those assets to A–1 and in turn to ATP. Compl. at ¶ 146.

Once again, defendants raise a myriad of arguments that require the examination of the facts rather than the amended complaint's allegations. Defendants assert Premier was formed and operating well after A–1 became insolvent and, for all practical purposes, after A–1 ceased to exist. Thus, A–1 could not have fraudulently conveyed any assets to Premier in violation of New York law. The date A–1 became insolvent and Premier started operations remains a matter of controversy. For example, during the hearings on ATP's motion for a preliminary injunction, a witness for Restivo testified that Premier began doing business in early February, 1990, but might have been incorporated before that date. ATP alleges that Premier was incor-

porated and doing business in January, 1990. Compl. at ¶ 88. I will not limit ATP's fraudulent conveyance claims against Premier because those dates are uncertain. I will assume, as I must, that ATP's allegations are true. Accordingly, the motions to dismiss on what are clearly matters of proof rather than pleading will be denied.

■ Defendants next take issue with ATP's assertions that the conveyances to Premier "rendered" A–1 insolvent, compl. at ¶ 142, and were made when A–1 knew that it would incur financial obligations that it would not be able to meet, compl. at ¶¶ 141 and 143. As to the first point only, I agree with Premier. ATP alleged that A–1 was insolvent as of December 31, 1989, compl. at ¶ 49, therefore no transfer of assets to Premier after that date could have "rendered" A–1 insolvent. This fact is, however, of little practical importance. Sections 273, 274, 275, and 276 also prohibit the fraudulent transfer of assets during insolvency and when debts have matured and remain unpaid. Thus, paragraph 142

§ 274 Conveyances by persons in business
    Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.
§ 275 Conveyances by a person about to incur debts
    Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.
§ 276 Conveyance made with intent to defraud
    Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

8. As I explain below, *supra* at 556–558, ATP's state law claims against Premier will be dismissed because this is not a proper venue in

which to try them. Whether or not count IX should be included in the dismissal order is a matter of contention between the parties. ATP maintains that it did not intend to assert a cause of action against Premier in this count and only included "Premier in Count IX ... to procure the equitable relief ... against individuals who have received fraudulent conveyances and are not considered purchasers in good faith." ATP's mem. at 31, n. 24. I fail to see the distinction between an attempt "to procure ... equitable relief" from Premier and asserting a claim against it. It is my understanding of count IX that ATP asserts its cause of action primarily against A–1 as the entity that transferred its assets. It also seems, however, that the other defendants must defend this claim because they are now allegedly in possession of the assets ATP wants returned to A–1 and to it. Moreover, A–1 has not shown any intention of responding to ATP's accusations. That burden has fallen on the other defendants, who seek the protection of their assets. Therefore, I will consider count IX to be a claim for relief against all the defendants, including Premier.

    In the motions to dismiss, Premier raised the most vigorous defenses to this claim. Its arguments, although moot with respect to it because I will dismiss it from count IX, will be attributed to its co-defendants. Unfortunately for them, those arguments are unpersuasive.

of the amended complaint is still viable despite the patent inconsistency.[9]

## IV. Tortious Interference with Contract

■ In count X of the amended complaint, ATP asserts claims for tortious interference with two different contracts with two different entities against two different groups of defendants. First, ATP alleges that its contracts with A–1, *i.e.*, the accounts purchase agreement and the security agreement, were tortiously interfered with by Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, in their personal capacities, compl. at ¶ 154, and after January 1, 1990, by Premier[10] and its principals, Restivo and Santangelo, compl. at ¶ 152. Second, ATP alleges that Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and A–1, "in their capacities as agents of A–1," compl. at ¶ 24, induced or caused HSN to breach "contractual duties to ... [ATP] ... under the purchased invoices." Compl. at ¶ 153. The first claim is proper, the second is not. The second claim must be dismissed because the term "contractual duties" is not defined and ATP does not allege how those duties became owing to ATP. It would be unfair to force defendants to guess what are the "contractual duties" owing from HSN to ATP.[11] There is no reference to any contract between ATP and HSN or to any assumption of contractual duties by HSN that benefitted ATP. The purchase invoices are not attached to the amended complaint, so the defendants and I cannot look to them for

guidance. Because these omissions may be easily rectified, I will permit ATP to amend its complaint and will address the defendants' substantive contentions concerning ATP's tortious interference claims at this time.

■ Defendants allege that ATP's claims for tortious interference with contractual relations are deficient for five reasons: (1) there is no allegation that defendants acted with the specific intent to harm ATP[12]; (2) the alleged interference with the HSN–ATP contract was not the legal cause of ATP's injuries; (3) ATP cannot hold corporate officers or directors liable for interference with the contractual obligations of their corporation; (4) ATP cannot charge defendants with the breach of certain contracts and also charge them with tortiously interfering with those same contracts; and (5) the alleged draining of A–1's assets to cause it to breach its contracts with ATP was privileged business activity.[13]

There is no merit to any of these contentions.

■ The cause of action for tortious interference with contract is defined in the Restatement (Second) of Torts, § 766. That definition has been adopted by the Pennsylvania Supreme Court. *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *cert. denied* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979).[14] Section 766 provides:

---

9. Defendants' arguments under Fed.R.Civ.P. 9(b) are without merit. The amended complaint adequately states a claim to void fraudulent conveyances.

10. Premier will be dismissed from this count. Its principals are amenable to suit here, so the claims against them may proceed. In this instance, the designation "defendants" will, of course, not include Premier.

11. My guess is that ATP is referring to HSN's obligation under the purchased invoices to make payment for goods received to ATP or to ATP's lockbox. My guess, however, is no substitute for proper pleading.

12. The concept that a defendant must act with specific intent to harm is outdated. All that plaintiff must show is that the defendant "inten-

tionally and improperly" interfered with the performance of the contract. Restatement (Second) of Torts, § 766, comments j, r, and s. I will analyze defendants' intent argument under this standard.

13. This fifth claim of error, like so many of defendants' positions, is not persuasive because it is premature. ATP alleges that defendants' actions were without privilege. Compl. at ¶¶ 152–54. I will not examine the evidence at this time to see if that is so.

14. The parties agree that Pennsylvania law applies for all of ATP's state law claims, but for the New York fraudulent conveyance claim.

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Defendants maintain that ATP failed to allege that defendants interfered intentionally. While it is true that ATP never uses the word "intentional" to describe defendants' actions, that defendants acted intentionally can be inferred from the amended complaint. ATP alleges that defendants acted "without privilege." That allegation in and of itself conveys that defendants acted with the intent to interfere and without justification. Restatement (Second) of Torts §§ 766 and 767. Moreover, Fed.R. Civ.P. 9(b) permits intent to be averred generally. ATP has done so. Lastly, intent can be inferred from the alleged acts. *Adler, Barish,* 393 A.2d at 1183 (defendants' acts indicated defendants's "desire" to obtain plaintiff's clients). The intent element is properly plead.

Assuming ATP amends its complaint to reallege an interference with an HSN–ATP contract and assuming that contract called for HSN's payment of money to ATP or to ATP's lockbox, defendants contend that ATP's injury was not their doing. They assert that if ATP was injured it was because A–1 never paid its debts to ATP and not because defendants induced HSN to pay A–1 rather than ATP or its lockbox. This argument has superficial appeal, but it lacks substance. While it is no doubt true that ultimately A–1 and not the other defendants failed to pay ATP its money, ATP alleges that defendants induced HSN to pay A–1, compl. at ¶ 156, *and* drained A–1 of its assets so it could not pay ATP, compl. at ¶¶ 155, 157–58. Thus, when defendants induced HSN to pay A–1, they knew that A–1 would not be able to pay ATP and as a result it would be injured. This claim could have been stated more clearly, but it is sufficient.

By definition, this tort necessarily involves three parties: the tortfeasor who interferes with a contract between the plaintiff and a third person. Here, ATP alleges that Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, in their personal capacities, interfered with ATP's contract with A–1. Because the individual defendants are officers and directors of A–1, special rules apply that make things a bit more complicated.

The general rule is that corporate officers are immune from interfering with the contracts of their own corporation. *Michelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005, 1007–08 (3d Cir.1987). This is so because a corporation can only act through its officers and agents; therefore, the actions of those individuals taken on behalf of the corporation are not considered tortious interference. *Du Sesoi v. United Refining Co.,* 540 F.Supp. 1260, 1275 (W.D.Pa.1982). When acting within the scope of his authority, an employee and his corporate employer are considered the same entity. *Daniel Adams Assoc. v. Rimbach Pub.,* 360 Pa.Super. 72, 519 A.2d 997 (1987). As the court in *Wells v. Thomas,* 569 F.Supp. 426, 435 (E.D.Pa.1983) explained: "when the individual defendants allegedly engaged in tortious interference with ... [plaintiff's] ... business relationship with ... [her employers] ..., they were managerial employees acting in their official capacities. Accordingly, no 'third party' can be said to have interfered with ... [her] ... relationship to her former employer." Where it is alleged, however, that the corporate officer or employee was acting in a personal capacity or outside the scope of his authority, an intentional interference claim may be asserted against him. *Avins v. Moll,* 610 F.Supp. 308, 318 (E.D.Pa.1984); *Yaindl v. Ingersoll–Rand Co. Standard Pump–Aldrich Div.,* 281 Pa.Super. 560, 422 A.2d 611, 619 & n. 8 (1980) ("It is widely held that an agent is liable if he intentionally and improperly induces his principal to break its contract with a third person."). Here, ATP alleges that Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo acted in their "personal capacities, without privilege," *i.e.,* outside the scope of their authority, inten-

tionally, and improperly. Compl. at ¶¶ 152 and 154. This is, then, an adequate pleading to establish personal liability and defendants' argument to the contrary is rejected.

Similarly, the defendants' contention that they cannot be liable for both breach of contract and tortious interference with contract is not correct. The tortious interference claim is asserted against the defendants in their "personal capacity," compl. at ¶¶ 152 and 154, and the breach of contract claims are asserted against them in their official capacity as agents of A–1, compl. at ¶¶ 24, 26–28, 32, 35, 37, 40, 42, 44–45, 53, 55–56, 81–82, 121–23. Obviously ATP could not collect double damages, but there is nothing wrong with its asserting alternative theories of liability.

In sum, ATP's tortious interference claim is deficient only to the extent the alleged HSN–ATP contract is not identified with any degree of particularity and its genesis is not described. These errors may be corrected by amendment of the complaint.

## V. Personal Jurisdiction over Premier

Premier questions this court's jurisdiction over it. As I noted in my prior memoranda, 755 F.Supp. at 1302–1303, resolution of the jurisdictional issue is a simple matter. It depends upon whether Premier has the minimum contacts with the United States to satisfy the requirements of due process and whether ATP's state law claims asserted against Premier are pendent to ATP's RICO claims. The answer to both questions is yes.

The RICO statute provides for "nationwide service of process" on defendants.[15] Thus, a federal court's jurisdictional reach extends throughout the nation in RICO cases. *Soltex Polymer Corp. v. Fortex Industries, Inc.*, 590 F.Supp. 1453, 1458 (E.D.N.Y.1984), *aff'd* 832 F.2d 1325 (2d Cir.1987). The defendant need only have sufficient minimum contacts with the United States to satisfy due process. Premier, a New York citizen, of course, has the minimum contacts with the United States. Therefore, this court has personal jurisdiction over it under section 1965. Moreover, since the state law claims asserted against Premier are pendent to the RICO claims, that is, the RICO and state law claims arose from a common nucleus of operative facts, this court has pendent jurisdiction over those claims and personal jurisdiction over Premier with respect to them.

This finding is of little practical importance, since I will dismiss the state law claims against Premier under Fed.R.Civ.P. 12(b)(3). *See supra* at 556–558.

## VI. Venue

Premier moves to dismiss the amended complaint as to it pursuant to Fed.R.Civ.P. 12(b)(3). It asserts that this court is not a proper venue to try this action. For many, but not all, of the same reasons I will permit the RICO claims asserted against Santangelo to be tried here, *see* 755 F.Supp. at 1303–1305, I will permit the RICO claims against Premier to be tried here.[16] I cannot, however, reach the

**15.** 18 U.S.C. § 1965(d) provides that:
All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

**16.** In contrast to the RICO claims asserted against Santangelo, which I found arose in this district, I cannot conclude that the RICO claims asserted against Premier arose here. My reasons are explained *supra* at 556–558. Additionally, Premier has not "transacted business" within this district. 18 U.S.C. § 1965(a). It has not "regularly carrie[d] on business of a substantial and continuous character within" this district. *Abeloff v. Barth*, 119 F.R.D. 315, 326

(D.Mass.1988). Nevertheless, the "co-conspirator venue theory" and the "ends of justice" exception makes this court a proper venue to hear the RICO claims against Premier. Premier's co-conspirators engaged in significant forum-related activity which can be attributed to Premier for venue purposes under the RICO statute. *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985). The "ends of justice" also require that ATP's RICO claims be tried in this district. 18 U.S.C. § 1965(b); *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285, 1290 (E.D. Wis.1985). This case has progressed considerably, Premier is represented by counsel who is well-acquainted with the facts and the witnesses, and the delay which would necessarily result from a transfer of this action against Premier to

same conclusion as to ATP's state law claims against Premier. This is not a proper venue for those claims and they must be dismissed from the amended complaint. Thus, Premier will be dismissed from counts VII, VIII, IX, and X.[17]

■■■ Venue in this case is determined by 28 U.S.C. § 1391(b),[18] which states:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, ..., be brought in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) *a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred* or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. (emphasis added).

Premier contends that venue is not proper here under any prong of section 1391(b). ATP concedes that none of the defendants

reside here and that the action could have been brought in New York, so it must rely on the second prong. Therefore, my decision must hinge upon whether or not "a substantial part of the events or omissions giving rise to the claim occurred" in this district. Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 311 (1990). The claims against Premier did not arise in this district.

Weighing in favor of keeping these claims in this district is the undisputed fact that ATP is a Philadelphia resident and has been injured here. These are no doubt strong, but not sufficient, factors in determining where the claim arose. No other factors, however, point towards this district.

In short, ATP argues that since Premier, or rather its founders, Restivo and Santangelo, are associated with A–1 and A–1 signed the accounts purchase agreement with ATP and agreed to have all transactions arising under the agreement "be deemed to be consummated in the Com-

---

another forum would not be in the interest of justice. Therefore, this is an appropriate venue in which to adjudicate ATP's RICO claims.

17. I realize that ATP maintains that it has not asserted a cause of action against Premier in counts I and IX and only names Premier in those counts "to procure" equitable relief. I will include count IX in my dismissal order for the reasons explained, *supra* at 553, n. 8. As for count I, since the state law claims against Premier will be dismissed, no injunction may issue against it based on those claims. However, the RICO statute permits injunctive relief in appropriate circumstances. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 204 (3d Cir.1990); *Chambers Development Co. v. Browning-Ferris Industries,* 590 F.Supp. 1528, 1540–41 (W.D.Pa.1984). Therefore, count I will not be dismissed against Premier. Moreover, I will not dismiss either the entire amended complaint or the other counts in which Premier is a defendant because Premier is not an indispensable party to the state law claims asserted against the other defendants, the state law claims are not indispensable to ATP's amended complaint, and Premier is properly a defendant in ATP's RICO claims.

18. On December 1, 1990, President Bush signed into law the Judicial Improvements Act of 1990, Pub.L. No. 101–650 (the "Act"). Section 311 of title III of this Act revised section 1391(b). Un-

fortunately, unlike the many other sections of Title III, *see, e.g.,* sections 310, 312, and 313, Congress did not provide an effective date for this amendment. I invited the parties to address the applicability of it to this case. After a review of their briefs and an unproductive search in the legislative history of this amendment, I conclude that section 311 should be given retroactive effect. Recently, the Third Circuit stated that: "'even where the intervening law does not explicitly recite that it is to be applied in pending cases, it is to be given recognition and effect.'" *Air–Shields, Inc. v. Fullam,* 891 F.2d 63, 65 (3d Cir.1989) (quoting *Bradley v. Richmond School Board,* 416 U.S. 696, 715, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1973). *See also In re TMI Coordinated Proceedings,* 735 F.Supp. 640, 642–43 (M.D.Pa.1990). In *Air–Shields,* the court held that the district court was required to proceed under the amended version of the remand provisions, even though the case was pending on the effective date of the amendment. *Id.* Here, although this case was pending at the time section 1391(b) became effective, I must use the new version of that statute. Nevertheless, even if I had not elected to use the new section 1391(b) in this case, the effect would have been negligible. Section 311 merely codifies the then-prevailing test for determining "where the claim arose." *See, e.g., Pennwalt Corp. v. Horton Co.,* 582 F.Supp. 438, 440 (E.D. Pa.1984). The amendment was not intended to change the standard for venue, but merely to clarify the prior statutory language.

monwealth of Pennsylvania," plf.'s exh. 1, ATP's claims against Premier arose here. This contention is without merit for a number of reasons.

First, Premier is not a party to any of the documents that formed the ATP–A–1 relationship. Premier was not even incorporated until well after the agreements had been signed. It did not agree to have "all transactions ... be deemed to be consummated in the Commonwealth of Pennsylvania." Even its alleged commissions and omissions could not have been anticipated by the accounts purchase agreement and therefore be deemed to have arisen here. That agreement did not anticipate Premier's formation, let alone its failure to protect ATP's fiscal interests.

Second, ATP does not allege that Premier performed any act in this district. ATP alleges that Premier diverted business from A–1, compl. at ¶ 106(44), Premier drained assets from A–1 which belonged to ATP, id. at ¶ 106(45), Premier caused A–1 to cease doing business, id. at ¶ 106(43), and Premier tortiously interfered with ATP–A–1 contracts, id. at ¶ 152. In effect, ATP alleges that it was damaged because Premier disrupted the business operations of A–1, a New York corporation, in New York. The mere fact that A–1 had contracted with a Philadelphia corporation, ATP, does not make its "successor" subject to suit here. Without something more concrete in the way of intra-forum activities, I cannot find that a "substantial part of the events or omissions giving rise to the claim[s] occurred" here.

■ Third, ATP's argument that "the important focus is that the scheme which Premier joined in 1990 had as its origin the Accounts Purchase Agreement, which was consummated in Pennsylvania, and the misconduct of Premier's co-conspirators under it," plf.'s mem. at 8, is similarly flawed. Besides the fact that Premier had nothing to do with the accounts purchase agreement, I cannot and will not examine the acts of Premier's co-conspirators in order to make a venue determination over the state law claims asserted against it. The "co-conspirator venue theory," absent an underlying federal statute which permits its use, *see, e.g., Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309 (9th Cir.1985) (securities statutes); *Arpet, Ltd. v. Homans,* 390 F.Supp. 908 (W.D.Pa. 1975) (securities statutes), has been rejected.[19] *See, e.g., Piedmont Label Company v. Sun Garden Packing Company,* 598 F.2d 491 (9th Cir.1979). Whatever Premier's co-conspirators are alleged to have done in this district is irrelevant for the purpose of the venue question.

■ Fourth, ATP's allegation that Premier interfered with the ATP–A–1 contracts does not support venue in this court. Even if Premier knew that its actions vis-a-vis A–1 would harm ATP, as long as there were no acts performed in this district, venue cannot be laid here. At best, it seems that Premier tortiously interfered with the ATP–A–1 contracts in New York by causing A–1 to be unable to perform its obligations. If ATP intends to pursue this claim against Premier, it should do so in that state.

Lastly, ATP asserts that its state law claims against Premier belong in this court, because Premier converted proceeds and assets of ATP which were in A–1's possession as a result of transactions under the accounts purchase agreement. Plf.'s mem. at 9. This assertion, too, is not convincing for the simple reason that if Premier converted ATP's "proceeds and assets," it did so in New York. There is no allegation to show that where or how these assets came to be in A–1's possession bears upon the question of whether a "substantial part" of Premier's activities took place in this district. There is no question that Premier

---

**19.** In my previous opinion, 755 F.Supp. at 1304, I found the co-conspirator venue theory to be applicable in RICO cases. There are a number of other judges who have disagreed and rejected the theory in RICO cases. *See, e.g., Payne v. Marketing Showcase, Inc.,* 602 F.Supp. 656 (N.D. Ill.1985); *Eaby v. Richmond,* 561 F.Supp. 131 (E.D.Pa.1983); *Sportmart, Inc. v. Frisch,* 537 F.Supp. 1254 (N.D.Ill.1982). While the applicability of the theory to RICO actions remains a matter of controversy, there is no case, however, which extends it to venue determinations for state law claims.

may have committed a number of unjust or even illegal acts against A–1 that harmed ATP in the process; however, all of those acts took place in New York and not here.

In sum, venue is not proper in this court with respect to ATP's state law claims against Premier. Accordingly, those claims will be dismissed from the amended complaint.

## VII. Conclusion

I rejected defendants arguments to dismiss ATP's RICO claims on the grounds that the allegations of the amended complaint are specific, a RICO enterprise is properly plead, and ATP's "lulling" theory is acceptable. I found ATP's count IX asserting violations of New York's fraudulent conveyance statutes to be adequate, despite a minor inconsistency in ATP's allegations. ATP did not describe adequately the source of any HSN–ATP contractual relationship and, therefore, its tortious interference with contract claim must be dismissed. I will permit ATP to amend that claim to explain the HSN–ATP contract. In all other respects, the tortious interference claim is sufficient. The exercise of this court's jurisdictional power over Premier is proper. However, venue is not properly laid here as to ATP's state law claims against Premier. Those claims will be dismissed, but ATP's RICO action against Premier may proceed here.

An order follows.

### ORDER

AND NOW, this 7th day of February, 1990, it is hereby ordered that:

1. Defendants' motions to dismiss the amended complaint are granted in part and denied in part;

2. Defendants' motions are granted with respect to count X;

3. Count X of the amended complaint is dismissed;

4. Plaintiff is granted leave until February 15, 1991, to amend its complaint to reallege its cause of action for tortious interference with contracts;

5. Premier's motion to dismiss the amended complaint pursuant to Fed.R. Civ.P. 12(b)(3) is granted with respect to counts VII, VIII, IX, and X;

6. Counts VII, VIII, IX, and X are dismissed as to Premier only;

7. Defendants' motions to dismiss are denied in all other respects.